UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11542-GAO

GREAT AMERICAN INSURANCE COMPANY,
Plaintiff,

v.

GRANITE STATE INSURANCE COMPANY,
Defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT
March 29, 2019

O'TOOLE, D.J.

The plaintiff, Great American Insurance Company, brought suit against the defendant, Granite State Insurance Company, contending that Granite State mishandled a lawsuit by failing to settle it before a jury returned a multi-million dollar verdict against an entity insured by both parties, causing Great American to pay the insured its policy maximum amount of $5 million. The Court conducted an eleven-day bench trial on the plaintiff's claim.[1] After the trial, the parties submitted proposed findings of fact and conclusions of law. Having considered the evidence and arguments of the parties, the Court now finds and concludes as follows.

## I.     Findings of Fact

Granite State Insurance Company provided Parkview Condominium Trust, the owner of a 318-unit high-rise residential condominium, with a general liability insurance policy of $1 million for the period January 1, 2007, through January 1, 2008. Great American provided excess liability insurance to Parkview for losses up to $5 million above the Granite State policy for the same time

---

[1] The plaintiff's complaint originally also included a Massachusetts General Laws Chapter 93A claim, but that claim was dismissed by stipulation of the parties.

period. Parkview's policy with Granite State gave the insurer both the duty and the right to defend Parkview against lawsuits for personal injury, as well as the duty to indemnify Parkview in the event of a judgment or settlement.

On July 11, 2007, Amadeo Gallotto, a boiler repairman, was called to Parkview to service its boiler. While performing his work, he was severely injured when he was scalded by hot water and steam exploding from a pressurized tank containing superheated water and steam. Represented by Attorney Robert Feinberg, he and his wife and son brought suit for negligence against Parkview in the Massachusetts Superior Court. As Parkview's primary liability insurer, Granite State was responsible for the defense of the Gallotto lawsuit. Christopher Flanagan, from the law firm of Wilson, Elser, Moskowitz, Edelman & Dicker LLP, was chosen by Granite State to serve as Parkview's defense counsel.

The case was tried to a jury in the spring of 2011, and the Gallottos prevailed on their claims against Parkview. The jury found that both Parkview and Gallotto were negligent in the happening of the accident, and that the proper allocation of comparative fault was 90% to Parkview and 10% to Gallotto. The jury awarded $5,750,000 in damages to Gallatto, which was reduced by 10% to $5,175,000. It also found in favor of his wife and son on their loss-of-consortium claims, awarding them $250,000 and $200,000 respectively. With applicable interest added, the final judgment against Parkview was in the sum of just under $7.5 million.

The verdict against Parkview exceeded the limits of both the Granite State and Great American insurance policies. Granite State paid its policy limit of $1 million, and Great American also paid the $5 million limit of its policy to satisfy the judgment against Parkview.

Great American thereafter brought the present suit alleging that Granite State breached its contractual and common law duty owed to its insured, Parkview, and therefore also to Great

2

American which stands in the insured's shoes, by failing to settle the Gallotto case prior to the jury's verdict.

The record evidence at trial in this Court includes documentary evidence of Granite State's assessment of the likelihood of an adverse verdict, consisting principally in communications between its claims handling staff and Flanagan. The record also includes a similar history of Great American's review of the Gallotto claim and of Granite State's handling of it.

### A. Flanagan's Pretrial Evaluation

About a year before the trial, Feinberg, the Gallottos' lawyer, made a formal settlement demand of $2.5 million in a letter to Flanagan. In a letter to Granite State's claims staff, Flanagan estimated a potential jury verdict amount of $1,500,000 to $2,000,000, given the severity of Gallotto's injuries. However, he noted that two factors could substantially reduce or even bar such damages. Because on the information known about the accident, the injury occurred when Gallotto himself opened a valve without taking certain prior safety precautions, Flanagan was of the opinion that there was a better than even chance of a defense verdict. Even if there were a verdict for the plaintiffs, however, the damage award would likely be reduced by a substantial percentage in light of what a jury might reasonably conclude was Gallotto's comparative negligence. Accordingly, Flanagan opined the case had a settlement value of $500,000 to $700,000. But he was pessimistic that the plaintiff would settle the case for less than $1,000,000. He adhered to those views in a later report in August 2010.

In a litigation report dated October 27, 2010, Flanagan adjusted his assessment of settlement value to a range of $500,000 to $1,000,000. He again expressed pessimism that the plaintiffs would agree to a settlement in that range because there was a large worker's compensation lien that would have to be satisfied from any insurance recovery by the plaintiffs.

3

At the end of the year, Flanagan notified the Granite State claims staff that a trial date had been set for March 28, 2011, and he recommended that a mediation should be held in "late-January/early-February." (Trial Ex. 36 at 7.) His assessment of the settlement value and likelihood of settlement remained the same. In a report submitted to Granite State in February 2011, Flanagan assessed the likelihood of a defense verdict to be 70%. In a conference call with claims staff, Flanagan expressed his opinion that "7 times out of 10 a jury should find the plaintiff 51% or more at fault" in the accident, defeating recovery, and in the other three times "the jury will find in favor of the plaintiff but certainly assess some comparative fault on his part." (Trial Ex. 4 at 17.)

A pretrial mediation session took place between the parties shortly before trial, but it was completely fruitless. According to Granite State staff activity notes, the plaintiff demanded (as before) $2.5 million, and Granite State countered with an offer of $100,000. Neither party moved significantly toward the other's position. The plaintiff's demand never went below $2,150,000, and Granite State's offer never went above $200,000. This apparently remained the state of negotiations until trial.

      B.      Great American's Position

Flanagan had been sending copies of his case evaluations to Great American as well as to Granite State. (See Trial Ex. 28 ("We have been copying Sharon Pole-Small, the adjustor for the excess carrier, Great American on our status reports.").) On March 4, 2011, Flanagan wrote to Brian DeSoto, a Vice President at Great American, to notify him that mediation had failed. He expressed his view that the case could be settled "between $1M and $1.5M," adding, "I do not expect that the plaintiffs will accept a six figure settlement under any circumstances. We are now beginning our preparation for trial." (Trial Ex. 42 at 1.)

In mid-March, Tim Thornton, who was following the case for Great American, asked Granite State's Anne Brenner for the status of settlement prospects. Brenner responded that "we are planning to try the case as plaintiff's demand is extremely unreasonable." (Trial Ex. 47 at 2.) She noted that defense counsel was assessing a 70% chance of a defense verdict and added, "I am hopeful that you support us in our decision to try this case." (Id.) Thornton responded with a demand "that this matter be settled on behalf [of] our insured within the primary limits" of the Granite State policy. (Trial Ex. 47 at 1.) At this point, there was no indication that Feinberg would agree to a settlement within the primary policy limits.

C.    Settlement Discussions During Trial

Trial of the case began March 28, 2011. The next morning, Flanagan called Brenner and reported that Feinberg had approached him and said that the plaintiffs would be willing to take less than the policy limit, perhaps something in the $900,000 range. Brenner responded with the suggestion that Flanagan explore whether the plaintiffs would be interested in a "hi[gh]-low"[2] with a $200,000 low and a $1,000,000 high if she could get approval for it. (Trial Ex. 4 at 10.) Flanagan brought the suggestion to Feinberg, who rejected it.[3]

At the end of the trial day on Tuesday, March 29, Feinberg approached Flanagan and inquired whether the defense would pay something like $650,000. Feinberg testified that he did not intend that figure to be a new demand. Rather, he testified that he did not believe the $200,000

---

[2] A "high-low" cabins an award to a plaintiff between a guaranteed minimum figure (the "low") and a maximum figure (the "high"). In the parties' example, no matter what the verdict, the plaintiff would recover at least $200,000, even in the event of a defense verdict, but more than $1,000,000, regardless of a higher jury award.

[3] There was conflicting evidence regarding who raised the possibility of a $200,000-$1 million high-low. Both Feinberg's and Flanagan's memories about this point was uncertain. My finding that Flanagan raised it at Brenner's suggestion is supported by a contemporaneous activity note by Brenner dated March 29 at approximately 9:30 a.m. (Trial Ex. 4 at 10.)

offer from the defense at mediation was the real limit to what would be offered, and he was trying to "tease out" what the defense ultimate settlement number might really be. (Tr. of Day One Bench Trial 109, Sept. 19, 2016 (dkt. no. 179).) He said he did not have authority from his clients to make a formal settlement demand of $650,000. Nonetheless, the conversation had the effect of inducing Granite State to increase its offer the next day to $300,000.

The exploratory effort by Feinberg to find out what the defense's true limit was may have had unintended consequences. First, whether meant as a formal demand or not, it was viewed by Granite State as undercutting the last actual demand of $900,000 or so. Moreover, the shift over the course of the day, from $900,000 or so in the morning to a hint at $650,000 in the afternoon, was taken by Granite State as a sign that Feinberg, after the first full day of trial, may have been worried about how well the trial was going.

Feinberg responded non-verbally to the defense offer of $300,000. He simply turned and walked away.

On Friday, April 1, Feinberg proposed a hi-low of $300,000 to $1,500,000. This offer implicated the excess coverage provided by Great American. The offer was discussed among Great American's claims team. Great American ultimately chose not to participate. It demanded of Granite State "that this matter be settled on behalf [of] our insured within the primary limits of their policy with [Granite State]." (Trial Ex. 63A at 2.)

At the end of the day Friday, however, the plaintiffs' position had also hardened, and Feinberg was communicating directly with counsel who was monitoring the trial for Great American, William Breen. Breen kept referring him to Flanagan. Feinberg later sent some text messages to Breen emphasizing the $1.5 million figure: "I later text[ed] Mr. Breen: 1.5 million. 500,000 of that is from you." (Tr. of Day One Bench Trial 118.) Feinberg testified that, while his

6

memory on the point was unclear, in his usual practice in negotiating settlements, a statement with a flat figure would normally have meant a flat figure demand. Granite State understood that the $1.5 million figure was a firm demand, and not the upper end of a high-low. At that point, Granite State determined that further settlement negotiations would not be worthwhile without Great American's participation, which was not forthcoming.

On Monday, April 4, the jury returned its verdict in the plaintiffs' favor.

## II.     Conclusions of Law

It is a "general rule" of Massachusetts law that a liability insurer "is held to a standard of reasonable conduct in its defense of its insured." Hartford Cas. Ins. v. N.H. Ins., 628 N.E.2d 14, 16 (Mass. 1994). The duty is in the first instance owed to the policyholder, here Parkview, but as an excess insurer, Great American is subrogated to the insured's rights respecting a breach of the duty to act reasonably. Id. at 15. The sole count of the complaint alleges that Granite State breached its duty owed to Great American under Massachusetts law to act reasonably and in good faith to settle the Gallotto claim within the limits of its policy.

Prior to the Hartford case, Massachusetts law with respect to whether a liability insurer wrongfully failed to settle a claim called for assessing "whether the insurer exercised good faith judgment on the subject." Id. at 16 (citing Abrams v. Factory Mut. Liab. Ins., 10 N.E.2d 82 (1937)). In Hartford, the Supreme Judicial Court reformulated the standard. The Court noted that "the trend in this country as a practical matter is toward the use of a negligence standard," citing insurance law treatises as well as cases from other jurisdictions. Id. at 17. The Court then stated the reformulated standard:

> The negligence standard by which the actions of an insurer concerning settlement will be tested hereafter will be in practice not significantly different from the good faith test that has been evolving in this Commonwealth. The test is not whether a

7

> reasonable insurer might have settled the case within the policy limits, but rather whether *no reasonable insurer would have failed to settle the case within the policy limits.* This test requires the insured (or its excess insurer) to prove that the plaintiff in the underlying action would have settled the claim within the policy limits and that . . . no reasonable insurer would have refused the settlement offer or would have refused to respond to the offer.

Id. at 17–18 (emphasis added).

Before the trial, Feinberg gave no signal that the plaintiffs were willing to settle the case within the primary policy limits. The plaintiffs' pretrial demands were above $2 million.

The only single figure demand that fell within the policy limits was the demand for something in the $900,000 range, made early in the trial. It was not unreasonable for Granite State to reject that demand, at least in the first instance. Although the amount was within Flanagan's suggested settlement range, it was not unreasonable to consider other possible arrangements also within that range. As the First Circuit has noted:

> An insurer's obligation to exercise good faith toward its insured does not require it to roll over and play dead vis-à-vis the claimants . . . . Negotiation is an art, not a science.

Peckham v. Cont'l Cas. Ins., 895 F.2d 830, 839 (1st Cir. 1990).

Put in terms of the Hartford formulation, Great American has not shown that "no reasonable insurer would have refused [that] settlement offer" at the time it was made. 628 N.E.2d at 18. After the $900,000 proposal was rejected, Feinberg shifted to other proposals.

Moreover, although Granite State rejected the demand in the $900,000 range, Flanagan countered with a high-low suggestion that was also fully within the policy limits. Under the $200,000 low/$1 million high proposal, if the plaintiffs prevailed, they would recover the full amount of the policy. Granite State was not in a position itself to offer a higher number; that required participation by Great American, which was quite plainly keeping its distance (suggesting

that it accepted Flanagan's assessment of the chances of a defense verdict or a substantial reduction in the amount of a damage award). Even if the plaintiffs lost, they would still have some recovery. That high-low, which put at risk the full policy amount, was far from an unreasonable offer by Granite State.

Granite State's experienced Massachusetts trial counsel had repeatedly assessed, based on his familiarity of the factual details of the case, that the defense had a better than even chance of prevailing at trial. He also advised that even if the plaintiffs prevailed, there would very likely be a substantial attribution of comparative negligence to Gallotto which would substantially reduce the amount of any judgment. An insurer is entitled to consider the advice of trial counsel in deciding whether to settle a case and at what price. See, e.g., Mayer v. Med. Malpractice Joint Underwriting Assoc. of Mass., 663 N.E.2d 274, 279 (Mass. App. Ct. 1996) ("The JUA's decision not to settle was reasonably based on the information and advice it received prior to trial. Defense counsel had repeatedly advised the JUA that if the case were to go to trial there was at least a fifty percent chance that the insureds would prevail."); Van Dyke v. St. Paul Fire & Marine Ins., 448 N.E.2d 357, 361 (Mass. 1983) ("St. Paul received independent advice from an expert witness and trial counsel, involved in the underlying action, that indicated that liability was not reasonably clear.").

While Feinberg's inquiry about a settlement at $650,000 was not intended as a reduced demand by the plaintiffs, it had the effect of solidifying the defense team's acceptance of Flanagan's assessment of the case. It also induced a counteroffer, suggesting some openness on Granite State's part to further negotiation, but Feinberg was clearly not interested in an offer at that level. After the $650,000 inquiry, the plaintiffs gave no signal that they would accept an offer entirely within the primary policy limits.

9

### III.   Conclusion

On the findings and for the reasons set forth above, judgment shall enter in favor of Granite State.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.<br>
United States District Judge